2023 IL App (2d) 220261-U
No. 2-22-0261
Order filed November 16, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-198 |
| SERAFIN CASTELLANOS, | ) ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Police officers were sufficiently familiar with defendant's appearance to allow them to opine he was the individual appearing in a video recording of the crime; error in failing to instruct the jury immediately prior to identification testimony from a police officer was not reversible where court subsequently charged the jury properly; admission of prior bad act was not error where it was relevant to identification of defendant; testimony concerning hearsay telephone records relied upon by expert in formulating his opinions did not entitle defendant to plain error relief; and trial court did not err in refusing defendant's request to give jury accomplice-witness instruction.

¶ 2                                  I. INTRODUCTION

¶ 3     Following a jury trial in the circuit court of Kane County, defendant, Serafin Castellanos, was convicted of two counts of first-degree murder, attempt (first-degree murder), aggravated battery, and aggravated discharge of a firearm. He now appeals, raising five issues. First, he asserts that the trial court erred in allowing two police officers to identify defendant from a surveillance video. Second, he contends that the trial court should have instructed the jury regarding the identification testimony of police officers. Third, he complains of the trial court allowing testimony concerning a prior bad act. Fourth, he argues that the trial court should not have permitted the State to present expert testimony concerning historical cell-site data. Fifth, he contends that trial court should have given an accomplice-witness instruction to the jury. For the reasons that follow, we affirm.

¶ 4                                  II. BACKGROUND

¶ 5     This case arises out of a shooting that occurred at about 12:50 a.m. at a restaurant and bar called La Flama D'Oro in Aurora on March 10, 2017. Jermaine Taylor and Anselmo Fernandez were shot and killed. Antonio Velasquez was also shot but survived.

¶ 6                          A. Pretrial Hearing on Video Identification

¶ 7     The State filed a pretrial motion to admit the identification testimony of two police officers. At a hearing on this motion, the State presented the following evidence. Darrell Moore, a detective with the Aurora Police Department, testified that he was assigned to investigate the shooting at La Flama. La Flama had a surveillance video system consisting of six cameras that recorded the area outside the bar and some cameras inside as well. La Flama is on the corner of Lincoln Street and Simms Street, and there are cameras on each side. Moore testified that the videos showed an individual firing a handgun multiple times.

¶ 8      It was learned that one of the suspects had been to the Aurora branch court during the morning of March 9, 2017, where he was also recorded by a video surveillance system. Moore testified that "one of the suspects that was at La Flama appears to be substantially similar to the person *** at the Aurora branch court the day before." That person appeared to be wearing clothing that was "very similar, if not the same" as the person in the La Flama video. The individual in the courthouse video was also wearing a gold chain. Moore identified defendant in a video taken outside the court building as well. An employee of the court processed paperwork pertaining to defendant that day, and she was able to identify defendant.

¶ 9      The video from La Flama was played for the court. Moore explained that it shows two cars approaching, which were believed to be the suspects. The cars went around the block on which La Flama is located. The video shows two individuals walking toward the corner on the side of the bar that bordered Lincoln Street. Moore described one of the individuals in the video as large, wearing a red shirt, black beanie, and black jacket. He stated he could see the color of this individuals shoes. The two individuals walked around the corner to the Simms side of the bar. The two individuals approached a group of people, and the large individual extended his arm and appeared to be firing a weapon. Moore testified that he knew defendant from this case and also from "hearing about his name around the police department," adding that he "knew the name before this investigation."

¶ 10     On cross-examination, Moore agreed that it was difficult to see the facial features of the suspect on the La Flama video. Moore was aware that one witness stated the shooter had been inside La Flama at one point. Moore further explained that the video showed a silver car and a red car drive by and that the cars appeared to return to the area. The silver car had distinct markings on its tires. He could not see who was in the cars when they initially passed by, but, following the

shooting, the video showed the shooter getting into one of the cars, which was then parked about half a block away. The shooter was accompanied by an individual wearing all black clothing, who was not brandishing a gun. Moore acknowledged that he would not have been able to identify defendant from the courthouse video. He agreed that one could not see any gold chains in the La Flama video.

¶ 11 The State then called Detective Jason Shettles, also of the Aurora Police Department. Shettles testified that he had grown up in Aurora, attending high school at West Aurora. He was familiar with defendant from "prior contacts, gang boards and stuff [they] had throughout the police department." He also was acquainted with defendant in high school. He had been in a daily physical education class with defendant for a year. He would sometimes pass defendant in the hallways as well. Shettles stated that he was familiar with defendant's appearance. He described defendant as "big, broad shoulders, kind of intimidating looking." He added that as "a bigger guy," defendant "had just kind of a certain swagger." As a police officer, Shettles had responded to calls where defendant was present.

¶ 12 When Shettles first observed the surveillance video from La Flama, he "immediately thought it was" defendant, based on "the size, the walk" and the fact that it "looked like him as he walked by, around the building." Shettles added, "He's a very large guy, kind of unmistakable." At one point, the view of defendant's face was "pretty good because he walked underneath the streetlight."

¶ 13 On cross-examination, Shettles acknowledged that part of what helped him recognize defendant was the similarity in clothing between the shooter in the La Flama video and the video defendant appeared in at the courthouse. When Shettles first saw the La Flama video, several other officers were watching as well, and a few "recognized him right away."

¶ 14    The State's next witness was Investigator Abe Villanueva. He testified that when he was younger, he lived next to his cousin Tito, who was older than him. Tito was friends with Guadalupe Magana. Villanueva would sometimes go to Tito's house to ride his Big Wheel tricycle on Tito's driveway.

¶ 15    Villanueva testified that he was familiar with defendant from both work and outside of work. They attended the same high school. Additionally, defendant would sometimes be at Tito's house. Defendant was "a bigger individual, huskier," and "walked with a presence" and "carried himself the same throughout the years." Generally, if Tito's friends were present, Tito would send Villanueva home. However, seeing defendant at Tito's house was "a regular occurrence." In high school, Villanueva would see defendant on a daily basis, "through passing periods." Outside of growing taller, defendant's appearance had not changed much since high school. In 2017, Villanueva observed defendant near the scene of an arrest (defendant was not the person arrested). Defendant drove by and "stuck his middle finger up at" Villanueva." Villanueva stated that this was aimed "directly at [him]."

¶ 16    During the morning of March 10, 2017, Villanueva was at the police department. He stated that "a couple detectives [were] watching a surveillance video as [he] was walking by." Villanueva recognized the individual in the video and stated, unprompted, that it was defendant. He added that he recognized defendant from "[h]is body structure, broad shoulders, bigger individual, round face, [and] the way he walked." On cross-examination, Villanueva acknowledged that he did not know defendant had a twin brother. He was approximately 5 to 13 years old when he observed defendant at his cousin's house.

¶ 17    The trial court found that Shettles and Villanueva were "very highly familiar with the defendant." It added that the probative value of their testimony outweighed any prejudice. Therefore, the trial court ruled that this testimony would be allowed.

¶ 18                                    B. The Trial

¶ 19    The case proceeded to trial, where Officer Matt Bowman first testified that he responded to La Flama in the early morning hours of March 10, 2017. He observed two individuals that had been shot. He attempted to render assistance to one of them, but the individual was non-responsive.

¶ 20    Raymundo Garcia testified next for the State. He is the manager of the night shift at La Flama. Generally, the door to the bar is locked, and customers enter through the restaurant area. La Flama has a motion activated video security system, with cameras outside the building. Garcia was present on the night of the shooting. The bar was closing at about 12:45 a.m., and customers were instructed to leave. James Gibbs was working as a security guard. Garcia did not see the shooting. A police officer made a copy of the video recorded by the security system. On cross-examination, Garcia testified that he heard the shots.

¶ 21    The State then called Alexis Wallace. Wallace stated that Derek Edwards was her boyfriend. She would visit Edwards, and they sometimes hung out with Edwards's friends. She also met Robbie Patton, who was called "Robbio," through Edwards. Wallace drove a red Mercury Milan that belonged to her parents. Typically, if she and Edwards went somewhere in her car, she would drive as her mother did not like anyone else driving it.

¶ 22    During the evening of March 9, 2017, she and Edwards went to Pepe's restaurant in Aurora with two of her cousins and Patton. Defendant was also present (this was the first time she met him). Defendant was wearing a red shirt. After about three hours, she and Edwards, along with a

"young man" and "lady" she did not know, left in her car. An individual called "Cheeto" was also in her car. Defendant, Patton, and another man left in a different car. They went to defendant's house. Wallace remained in the car for about 10 minutes. Edwards went inside and when he came back, he insisted on driving Wallace's car. They followed a silver car to La Flama. Edwards parked down the street with the silver car still in front of them. No one exited her car, but defendant and Patton got out of the other one. Defendant was wearing "a dark hoody that was zipped up a little bit, a red shirt and his gold chain medallion." Patton was wearing a black sweatsuit and a hat. Patton and defendant ran past Wallace's car toward La Flama. She heard "[w]hat sounded to be gunshots." She then heard people running. She heard car doors open and close from the vehicle in front of them, and they then drove off.

¶ 23    They went to defendant's house in Oswego (Wallace clarified that this was a different residence than the one they had visited earlier). Wallace asked Edwards what had happened, and he replied, "nothing." She did not hear anyone else talking about the shooting. She saw defendant on one occasion after the shooting. Wallace acknowledged that she did not go to the police. She viewed the La Flama video and identified her car in it as well as the light colored car they were following. She also identified defendant and Patton in several photographs showing the outside of La Flama derived from the surveillance video. Wallace also identified defendant in a photographic lineup.

¶ 24    On cross-examination, Wallace stated that when the Aurora police contacted her, she voluntarily complied with their requests. She and her mother went to speak with the police. By this time, Edwards had been murdered, of which she was aware. She initially told the police that she did not let Edwards drive her car because her mother would not allow it. She also told them that only an individual called "Rubio" exited the car after they parked near La Flama.

¶ 25    Subsequently, Wallace retained an attorney who negotiated an immunity agreement with the State. Wallace agreed that she repeatedly told the police that the car they were following was black. She never saw anyone with a gun on the night of the shooting. On redirect-examination, Wallace acknowledged that a police report states that she also told the police that defendant exited the vehicle they were following when she spoke to them. Defendant's gold medallion, while large, could fit in the palm of one's hand.

¶ 26    The next witness for the State was Armando Perez. He was a customer at La Flama on the night of the shooting. He and two others—Antonio Velasquez and Arnoldo Cepeda—planned to go somewhere else when La Flama closed. The three men were speaking in the parking lot. He heard gunshots, and Velasquez was struck. On cross-examination, Perez stated that he did not see the shooting or the shooter.

¶ 27    The State then called Arnoldo Cepeda. Cepeda testified that he was at La Flama on the night of the shooting. He was with Perez and Velasquez. As they left the bar at closing time, they were arguing over who would drive. Velasquez was sitting in the front, passenger seat of his car. Cepeda heard gunfire. Velasquez got shot in the cheek. Cepeda saw someone running away, but only could say that the person was dressed in dark clothing. They ran back into the bar, having to step over someone who was lying in the vestibule. On cross-examination, Cepeda explained that he could not identify the shooter because he was more concerned with not getting shot.

¶ 28    James Gibbs next testified that he was working as a security guard at La Flama on the night of March 9, 2017. The bar closed at 1 a.m. He started asking patrons to leave about 12:45 or 12:50 a.m. He then stepped out of the main entrance. He observed two individuals walking down the street in front of La Flama. They rounded the corner to come around the side of the bar. One was of "Latin or Hispanic descent" and the other was an "African-American male." The African-

American male was wearing all black clothing, specifically "a hoody and a baseball hat." The other individual was wearing "a black pant" and a "[d]arker gray," possibly black denim jacket. Gibbs added that this individual was either wearing a red shirt underneath the jacket or the lower portion of the jacket was red. The Hispanic individual lifted his arm and fired a gun. Both individuals ran east down the street. Gibbs estimated that this person was about six-foot, two-to-three inches tall, and weighed 230 pounds. Gibbs stated that he would not be able to identify the shooter in a lineup. On cross-examination, Gibbs stated that he could not see a gold chain on the shooter. After the shooting, a patron named Sam ran to the vestibule but did not make it inside and laid down in the doorway. Gibbs did not actually see the shooting.

¶ 29 Detective Christopher Coronado testified that he viewed the video recording. He acknowledged that it was difficult to make out any facial features in the recording.

¶ 30 Detective Moore (who testified in the hearing on the motion *in limine*) testified that he was one of the lead detectives on this case. Moore prepared a photographic lineup for Alexis Wallace to view. The police obtained defendant's cell phone and its records from AT&T. The phone was recovered from defendant several months after the shooting at La Flama. The phone records were sent to Michael Fegely for analysis. He also obtained records pertaining to defendant from Facebook. These records showed defendant at various locations on March 9, 2017. In a post at 7:23 p.m., defendant indicates that he is at Pepe's restaurant and is "still drinking." Another post indicates defendant was at Pepe's around 5 p.m., and another indicates he was there around noon. Defendant was arrested for the instant offense on January 30, 2018.

¶ 31 The State then called Fegely, who stated that he is a "subject matter expert in *** geolocation analysis." He acknowledged that he was being paid $1800 per day for his testimony. The trial court recognized him as an expert in the field of "historical cell site analysis and call

detail records." The trial court permitted defense counsel to inquire regarding Fegely's qualifications, but did not permit counsel to inquire into the validity of his methodology, stating that, if defense counsel wished to challenge it, counsel should have moved for a Frye hearing in a pretrial motion.

¶ 32 Fegely explained how he analyzes cell phone records. Moore gave Fegely records from defendant's phone generated between 8:30 a.m. on March 9, 2017, and March 10, 2017, at approximately 1:19 a.m. Fegely acknowledged that this analysis did not provide a precise location of where a phone is at any given time. From 9:14 a.m. to 11:42 a.m., the records indicate that defendant's phone was in an area that encompassed the Aurora branch courthouse. After this, they indicated that defendant's phone was in an area in which Pepe's is located. Another method of tracking cell phones (the Network Event Location System (NELOS)) indicated that defendant's phone was in an area containing Pepe's from 2:43 p.m. until 12:19 a.m., but, Fegely added, "[T]here's a lot of variance in there." Moreover, between 12:36 a.m. and 1:19 a.m. on March 10, 2017, data from three of six towers placed the phone in an area with La Flama within its boundaries. Fegely agreed that he could not tell who was in possession of the cell phone.

¶ 33 On cross-examination, Fegely stated that the accuracy rate of such data was 95 percent, keeping in mind that the data gives an estimated area. Moreover, sometimes phones may not use a certain tower because it is experiencing too much traffic, so they "reach out to a different cell site." He acknowledged various factors can affect signal strength.

¶ 34 The State presented Investigator Villanueva (who testified during the pretrial hearing) as its next witness. Villanueva testified that when he was 5 or 6 years old until he was 13 or 14, he lived next to his cousin. Defendant was a friend of his cousin and would come over to his cousin's house. He would see defendant "maybe twice a week, if that." He would also see defendant in

high school in the hallways. Also, in 2017, Villanueva was assisting other officers responding to an incident (defendant was not involved), and defendant drove by and "flipped [Villanueva] off with his middle finger."

¶ 35 Villanueva testified that he saw the surveillance video from La Flama shortly after the shooting occurred. Other officers were viewing it as Villanueva walked by. He told them that it was defendant in the recording. The video was then played, and Villanueva identified defendant for the jury. Villanueva explained that he based his identification on defendant's round face and body structure as well as the way defendant walked. Villanueva stated that he was sure it was defendant.

¶ 36 On cross-examination, Villanueva could not describe what was different about the way defendant walked, outside of saying it was "different." He acknowledged that the video was "not that clear." Villanueva agreed that his identification of defendant was not "based on [his] law enforcement experience," rather it was based on his "personal observations with the defendant."

¶ 37 On the morning following Villanueva's testimony, the trial court instructed the jury for the first time as follows:

"Good morning, ladies and gentlemen. I hope you had a good evening. Before we start our testimony today, I want to read you a jury instruction. This relates to the testimony you heard yesterday regarding Investigator—or Officer Villanueva from the Aurora Police Department.

That instruction is as follows: You have before you evidence that a law enforcement officer made an identification of the defendant from a video recording. It is for you to determine what weight, if any, you should be given to that evidence. In determining the

weight to be given to this evidence, you should not draw any inference from the fact that the witness is a law enforcement officer."

¶ 38    The State called Jesus Bautista.  Bautista acknowledged that he was testifying in accordance with an agreement with the State and that he was "getting a break from coming here and testifying."  He stated that he knew defendant, Edwards, and Patton.  He had known defendant since 2014 and had socialized with him about 10 times.  He identified the shooter in the La Flama video as defendant and the person accompanying him as Patton.  He explained that he recognized defendant's face, build, and walk.  On cross-examination, Bautista recounted his extensive criminal history.  He agreed that he was not present at La Flama at the time of the shooting, nor was he at Pepe's that day.  He initially identified the suspects in the shooting as Lupe and Patton. He explained that Lupe was a different individual that is built similarly to defendant but is taller and has more hair.  He believed Lupe's last name was Magana.  He added, "Lupe would always be with [Patton]."

¶ 39    Jamie Marungo testified next.  He was a customer at La Flama on the night of the shooting. He knew several of the patrons, including Sam and Jermaine, the two victims who were killed.  He was drinking that night and left the bar at closing time.  He was smoking a cigarette outside when he heard gunshots and ran back inside.  Sam ran into the vestibule and fell on Marungo.  Marungo tried to pick Sam up, but Sam's eyes rolled back in his head and he stopped moving.

¶ 40    Antonio Velasquez told the jury that he was at La Flama on the night of the shooting.  He went there to meet Cepeda.  Perez was also present.  He left when the bar started to close.  He got into the passenger seat and told Cepeda to drive.  Velasquez "started hearing gunshots."  He ducked but nevertheless got shot in the face.  Velasquez went back into the bar, where he saw Taylor

dying. After he got shot, he saw a "big person running." An ambulance transported Velasquez to the hospital. On cross-examination, Velasquez acknowledged that he was "drunk."

¶ 41 The State's next witness was Officer Shettles, who testified at the pretrial hearing. Before Shettles testified, the State told the court that it needed to instruct the jury regarding identification testimony from a law enforcement officer. Accordingly, the trial court instructed the jury as follows:

"Another police investigator is going to testify shortly. And I'm going to read you another—same instruction I read before. You have before you evidence that a law enforcement officer made an identification of the defendant from a video recording. It is for you to determine what weight, if any, should be given to that evidence. In determining the weight to be given to this evidence, you should not draw any inference from the fact that the witness is a law enforcement officer."

The State then proceeded with its examination.

¶ 42 Shettles stated that he attended West Aurora High School from 1994 to 1997. During this time, he went to school with defendant. Defendant was in his physical education class, and Shettles would sometimes see him in the hallways. Shettles identified pictures of both him and defendant in a 1996 yearbook. In high school, defendant was "large, [had] broad shoulders, [and was a] big guy." He walked with a "swagger." Shettles stated that defendant's appearance had not changed much over the years.

¶ 43 Shettles testified that his involvement in the instant case was minimal. He did see the La Flama surveillance video and was able to identify defendant in it. Shettles explained how he could tell it was defendant: "Just his size alone. I mean, just the way he walks, the way he moves,

his build and everything. As he gets closer to the corner, he passes through the camera and he kind of looks up and you can tell it's him."

¶ 44 On cross-examination, Shettles denied knowing Clemente Juarez. He conceded Juarez appeared similar to defendant. When asked whether Juarez looked like defendant's twin, Shettles replied, "He looks similar." Shettles was not aware that defendant had been expelled from school. On redirect-examination, Shettles testified that in the 1996 yearbook, he and defendant are grouped with sophomores while Juarez is placed with the juniors.

¶ 45 The State then rested, and defendant called Elisa Caballero Favela. She attended middle school with defendant in 1993 and 1994. She and defendant were friends in 2017. In June or July 2017, she was approached by the police. Defense counsel showed her one of the photographs taken from the La Flama video. She said that the person in the photograph was not defendant. She explained that defendant was "bulkier" and "bigger" than the person in the photograph. The person was not wearing chains, as defendant typically did. She viewed another photograph and said that defendant had bigger cheeks than the individual in it.

¶ 46 Defendant also presented Guadalupe Magana. He testified that he knew Villanueva, who had grown up next door to Magana's cousin's house (Jose Mendoza). Defendant has been Magana's friend since middle school. He did not know defendant prior to this time, so defendant would not have been coming around Mendoza's house. He never saw Villanueva and defendant together. Villanueva's family was strict and did not let him go to Mendoza's house. Magana testified that defendant is right handed. On cross-examination, he acknowledged that he was not at Mendoza's house all of the time. He also agreed that he is a convicted felon.

¶ 47 Defendant then rested. Prior to deliberation, the trial court instructed the jury, *inter alia*, as follows:

"You have before you evidence that a law enforcement officer made an identification of the defendant from a video recording. It is for you to determine what weight, if any, should be given to that evidence. In determining the weight to be given to this evidence, you should not draw any inference from the fact that the witness is a law enforcement officer."

Defendant was convicted of two counts of first-degree murder, attempted first-degree murder, aggravated battery, and aggravated discharge of a firearm. He was sentenced to natural life in prison plus a consecutive term of 45 years. This appeal followed.

¶ 48                                              III. ANALYSIS

¶ 49    On appeal, defendant raises five main issues. First, defendant argues that the trial court erred in permitting Villanueva and Shettles to identify him in the La Flama video. Second, defendant contends that the trial court failed to properly instruct the jury regarding identification testimony given by police officers. Third, defendant complains of the admission of a prior bad act. Fourth, he asserts that the testimony of the State's expert on cell site analysis amounted to inadmissible hearsay. Fifth, he contends that the trial court should have given the jury an accomplice-witness instruction. We find none of these arguments well founded.

¶ 50                                      A. Identification Testimony

¶ 51    Defendant initially complains that the trial court allowed Villanueva and Shettles to opine that he was the shooter in the La Flama surveillance video. Such decisions are within the discretion of the trial court and will only be disturbed if that discretion is abused. *People v. Thompson*, 2016 IL 118667, ¶ 49. An abuse of discretion occurs only if no reasonable person could agree with the trial court. *People v. Farris*, 2012 IL App (3d) 100199, ¶ 26.

¶ 52    Testimony of a lay witness regarding the content of a video recording where the witness has no firsthand knowledge of the content of the recording is treated as lay-opinion testimony.

See, *e.g.*, *People v. Sykes*, 2012 IL App (4th) 111110, ¶¶ 35-42 (collecting cases); see also Ill. R. Evid. 701 (eff. Jan. 1, 2011). Thus, "the identification testimony of a lay-witness who has no personal knowledge of the events depicted on [a] tape itself is admissible where (1) the witness has personal knowledge of the defendant before the occurrence and (2) the testimony aids the trier of fact in resolving the issue of identification and does not invade the jury's fact-finding duties." *People v. Owens*, 394 Ill. App. 3d 147, 154 (2009). Moreover, Illinois Rule of Evidence 701 imposes the following requirements:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

Such testimony is helpful if the witness is more likely to identify the defendant from the recorded image than is the jury. *Thompson*, 2016 IL 118667, ¶ 41 (quoting *United States v. White*, 639 F.3d 331, 336 (7th Cir. 2011)).

¶ 53    In *Thompson*, the Illinois Supreme Court provided a framework to address the admissibility of lay opinion identification testimony and whether law enforcement may offer such testimony. *Id*. ¶ 40. To safeguard the defendant's rights, *Thompson* determined that when the State seeks to introduce lay opinion identification testimony from a law enforcement officer, the circuit court should afford the defendant an opportunity to examine the officer outside the presence of the jury. *Id.* ¶ 59. "To lessen any concerns regarding invading the province of the jury or usurping its function" (*id.*), the court also mandated that the circuit court instruct the jury, both before the

testimony *and* in the final charge to the jury, that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer. *Id.* (emphasis supplied). The *Thompson* court adopted a totality of the circumstances approach and set forth a number of factors to consider in determining whether testimony of this nature would be helpful to the jury: (1) the witness's level of familiarity with the defendant's appearance, (2) the witness's familiarity with the defendant's appearance at the time the image was recorded, (3) whether the defendant had disguised his appearance at the time of the recording, (4) whether the defendant had altered his appearance for the trial, and (5) the clarity of the recording and the completeness of the subject's depiction. *Id.* ¶ 51. If one or more of these factors is present, there is some basis to conclude that the witness is in a superior position to the jury to identify the defendant from the image in question *Id.* ¶ 49. The absence of any particular factor does not render the opinion inadmissible. *Id.* ¶ 51.

¶ 54 *Thompson* further provided that "a lay witness need only have sufficient contact with the defendant, which the jury would not possess, to achieve a level of familiarity that renders the lay opinion helpful." *Id.* ¶ 42 (citing *United States v. Beck*, 418 F.3d 1008, 1014 (9th Cir. 2005)). Generally, "a showing of sustained contact and/or special knowledge of the defendant is not a prerequisite to a lay witness giving identification testimony." *Id.* (citing *United States v. Holmes*, 229 F.3d 782, 788 (9th Cir. 2000)). The extent of a witness's prior familiarity with the defendant is a matter of weight rather than admissibility. *Id.* ¶ 49.

¶ 55 Defendant, pointing to the testimony of Moore during the pretrial hearing on the State's motion *in limine* to admit this testimony, first asserts that the surveillance video was sufficiently clear that the jury needed no help in interpreting its contents. Defendant contends that Moore, who "viewed the images from the exact same perspective as a juror," "was able to view the videos and

screenshots and formulate his opinion of who he believed was the shooter." Hence, he concludes, "[L]ike Moore, the jurors were completely capable of making their own decision as to whether Defendant appeared on the La Flama video." First, it should be noted that Moore never told the jury that defendant was the shooter in the LaFlama video. Second, the issue is whether the trial court erred in allowing lay opinion testimony as to the identity of the shooter in the La Flama video. The clarity of the recording and the extent of the individual's depiction is indeed one of the five factors set forth by the supreme court to consider here. *Id.* ¶ 51. However, the supreme court also stated that the absence of any given factor does not make such testimony inadmissible. *Id.* Moreover, we disagree that the video is so clear that no reasonable person could agree with the trial court that the opinions of Officer Shettles and Investigator Villanueva would be helpful to the jury. We note that Officer Moore stated on cross-examination at the pre-trial hearing that it was difficult to discern the facial features in the La Flama video. Further, we have viewed the images recorded by La Flama's surveillance system, and they are not particularly clear and to the extent they are clear, the depiction of the subjects' faces is brief and fleeting.

¶ 56    Defendant next argues that the evidence did not show that Villanueva and Shettles were sufficiently familiar with defendant's appearance to permit them to opine as to the identity of the shooter in the La Flama video. We note that Villanueva, in his pretrial testimony, said that he would see defendant next door at his cousin's house and that this was a "regular occurrence," and he saw him on a daily basis during "passing periods" in high school. Also, in 2017 (the year of the shooting), Villanueva saw defendant drive by him and stick "up his middle finger."

¶ 57    Shettles, like Villanueva, went to high school with defendant. Shettles testified the he attended physical education class daily with defendant for a year. He told the court at the pretrial hearing that he was familiar with defendant from "prior contacts, gang boards and stuff [they] had

throughout the police department." Defendant cites no case where a similar level of familiarity was held an insufficient basis to allow a witness to make an identification. Indeed, as noted above, "a showing of sustained contact and/or special knowledge of the defendant is not" required. *Thompson*, 2016 IL 118667, ¶ 42. The extent of familiarity is a matter of weight not admissibility. *Id.* ¶49. We think a reasonable person could conclude that these two officers were sufficiently familiar with defendant to offer their opinions.

¶ 58     Defendant notes that the officers referenced several common characteristics in describing defendant that would not differentiate him from a significant portion of the population, such as his size, gait, and round face. The same could be said of many characteristics we use to identify people on a regular basis; that is, many individuals share the same hair color, eye color, or weight, yet we successfully use such characteristics to identify them. In any event, defendant cites nothing to substantiate the proposition that common characteristics have no value in making identifications, and we find this contention unpersuasive.

¶ 59     Defendant cites a number of sister state decisions in support of his argument, but we have reviewed them and they are not helpful. He also contends that none of the factors set forth in *Thompson*, 2016 IL 118667, ¶ 51, weigh in favor of allowing these opinions. We disagree. Regarding the first factor, as explained above, a reasonable person could conclude that the two officers were sufficiently familiar with defendant. Also, a reasonable person could conclude that the second factor—the witnesses' familiarity with the defendant at the time the images were recorded—weighs in favor of the admissibility of these opinions to a degree, as Villanueva viewed defendant in 2017 when defendant gave him the finger and both officers testified they were aware of defendant in the course of their duties. Admittedly, the third and fourth factors (whether defendant altered or disguised his appearance at the time the video was recorded or at trial) do not

militate in favor of admission. The fifth factor, the clarity of the video, also weighs in favor of admission. As defendant concedes, "The La Flama video is not unmistakably clear, nor hopelessly obscure." Under such circumstances, a reasonable person could conclude that it was not so clear that the jury needed no assistance in interpreting it. In any event, given the conflicting considerations and in light of the totality of the circumstances, we cannot say that no reasonable person could agree with the trial court that these opinions were admissible.

¶ 60    In sum, defendant has not convinced us that the trial court abused its discretion in allowing this testimony.

¶ 61                    B. Jury Instruction—Identification By A Police Officer

¶ 62    Defendant next complains that the trial court failed to properly instruct the jury regarding identification testimony given by a law enforcement officer. In *Thompson*, 2016 IL 118667, ¶ 59, the supreme court mandated specified precautionary instructions to the jury before this testimony is presented and in the final charge to the jury. Whether the jury was properly instructed is reviewed using the abuse-of-discretion standard. *People v. Green*, 2017 IL App (1st) 152513, ¶ 61.

¶ 63    In this case, Villanueva was the first law enforcement officer to testify that the individual shooting in the La Flama video was defendant. The trial court did not instruct the jury in accordance with *Thompson* before Villanueva testified or following his testimony that day. However, the following morning, the trial court, specifically referencing Villanueva's testimony, instructed the jury as required by *Thompson*. It again instructed the jury in this manner prior to Shettles' testimony and before the jury began deliberation.

¶ 64    This issue was not included in defendant's posttrial motion and is therefore forfeited. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). Accordingly, only plain-error review is available.

*Id.* at 175-76. The first step in conducting plain-error review is to determine whether any error occurred in the first place. *Id.* at 187. Thus, we first turn to that question.

¶ 65     In this case, we are concerned only with the timing of the required instruction. This was not done in the precise manner set forth in *Thompson,* which states that the charge should be given *prior* to such testimony being offered (*Thompson*, 2016 IL 118667, ¶ 59); not after. That was error. The question, then, is whether giving the instruction three times subsequently cured that error.

¶ 66     Defendant argues that it cannot. He asserts, "Given you can't un-ring a bell, it would be nearly impossible to shift the jury's perspective on how they received that testimony and the weight they attributed to it in their decision due to the fact that the witness is a law enforcement officer." Defendant cites nothing in support of this proposition. Case law indicates otherwise.

¶ 67     Illinois courts have long recognized the effect of a curative instruction. In *People v. Hall*, 194 Ill. 2d 305, 345 (2000), the State inquired about the defendant's gang membership. The defendant's objection was sustained. The *Hall* court held, "Any error in asking this question was cured when the trial court sustained the objection and instructed the jury at the end of the trial to disregard questions to which objections were sustained." *Id.*; see also *People v. Coleman*, 158 Ill. 2d 319, 343 (1994). Similarly, in *People v. Starks*, 287 Ill. App. 3d 1035, 1043 (1997), the trial court's instruction that closing arguments are not evidence and remarks not based on evidence must be disregarded was held sufficient to cure the State's unfounded claim the DNA testing would have showed that blood on the defendant's shoes came from the victim. In *People v. Patterson*, 154 Ill. 2d 414, 467 (1992), the supreme court held that an instruction was sufficient to cure the State's improper reference to the defendant's post-arrest silence. A jury is presumed to follow the instructions that the court gives it. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Defendant does not explain why an instruction cannot retroactively cure an error in any of these circumstances,

but in the instant case, that the instruction was given after Villanueva's testimony could not affect how the jury evaluated that testimony.

¶ 68     Defendant relies extensively on *People v. Stitts*, 2020 Il App (1st) 171723. The nature of the error in *Stitts* is not totally clear, but it appears the trial court never gave the instruction required by *Thompson*. *Id.* ¶ 25. Thus, the question of whether giving it belatedly was sufficient to cure any error was not addressed. Defendant notes that the *Stitts* court stated that the provisions of *Thompson* are "mandatory." *Id.* ¶ 28. While we wholeheartedly agree, this says nothing about whether a deviation from this mandatory procedure is amenable to being cured by a subsequent instruction. In any event, assuming the error was not cured, under either prong of the plain error doctrine, the argument fails. See *Herron*, 215 Ill. 2d at 186-87 (plain error doctrine allows consideration of unpreserved error where (1) the evidence is close and the error prejudicial or (2) regardless of the closeness of the evidence, the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process).

¶ 69     In this case, though it was error, it was neither prejudicial nor so serious that it affected the fairness of the trial or the integrity of the system. The evidence was not closely balanced. Most significantly, Wallace placed defendant at the scene at the time of the shooting. Her testimony was corroborated by two police officers and a civilian who identified defendant in the surveillance video. It was further corroborated, albeit more generally, by the cell phone records. Moreover, while defendant argues generally that this was a serious error, he cites no case where a defect of the sort that purportedly exists here was found to be a structural error of sufficient gravity as to deny a defendant a fair trial. Hence, we deem this argument forfeited and plain error review is unavailable.

¶ 70    In sum, while the required procedure was to instruct the jury as set forth in *Thompson* prior to Villanueva taking the stand, not after his testimony, the failure to do so did not amount to reversible error here.

¶ 71                                 C. Prior Bad Act

¶ 72    Defendant next argues that the trial court should not have allowed the State to introduce evidence of a prior bad act he allegedly committed, specifically, giving the middle finger to Villanueva while driving by.  Generally, evidence of prior bad acts and other crimes is inadmissible simply to show a defendant's propensity to commit crimes.  *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010).  It is, however, admissible if relevant to some other issue properly in dispute, such as motive, intent, identity, accident, or absence of mistake.  *Id.*  Even if relevant to such an issue, to be admissible, the evidence's probative value must not be substantially outweighed by the risk of unfair prejudice to the defendant.  Ill. R. Evid. 403 (eff. Jan. 1, 2011).  We review this issue for an abuse of discretion.  *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 73    Here, the evidence at issue was clearly relevant to the identification of defendant as the shooter at La Flama.  As explained above, one of the factors to consider in determining whether to permit Villanueva to identify defendant in the surveillance video was his familiarity with defendant.  A reasonable person could conclude that by giving the finger to Villanueva, defendant drew Villanueva's attention to himself.  Absent the gesture, defendant was just another passerby.  This interaction between defendant and Villanueva was particularly important because it happened in 2017 and occurred near in time to the shooting (we note defendant attacks much of the rest of the testimony of Villanueva and Shettles as being stale).  A reasonable person could further conclude that the risk of unfair prejudice did not substantially outweigh the relevance of this evidence.  Defendant's act was akin to swearing at Villanueva, albeit through a hand signal rather

than a verbalization. And, "the middle finger—like the f-word—has become part of the American vernacular and, in the process, shed its taboo status." Ira P. Dobbins, *Digitus Impudicus: The Middle Finger and the Law*, 41 U.C. Davis L. Rev. 1403, 1410 (2008) (internal quotation marks omitted). A reasonable person could conclude that the unfair prejudice of allowing this evidence— if any—did not outweigh its probative value. After all, even sex crimes and felonious conduct have been held to not be unfairly prejudicial. See, *e.g.*, *People v. Wilson*, 214 Ill. 2d 127, 141 (2005); *People v. Deenadayalu*, 331 Ill. App. 3d 442, 449 (2002).

¶ 74    Accordingly, no abuse of discretion occurred here.

¶ 75                                    D. Cell-Tower Evidence

¶ 76    Defendant next argues that the trial court should not have permitted Fegely to give expert testimony based on the records provided by AT&T (defendant's cell phone provider). Defendant argues that the records provided by AT&T were hearsay and the affidavit attesting to their authenticity was not sworn as required by Illinois law. See *People v. Hauck*, 2022 IL App (2d) 191111, ¶¶ 49-50. Contrary to defendant's position, it is well established that an expert can rely on hearsay in formulating his or her opinions: "While the contents of reports relied upon by experts would be inadmissible as hearsay if offered for the truth of the matter asserted, an expert may disclose the underlying facts and conclusions for the limited purpose of explaining the basis for his opinion." *People v. Nieves*, 193 Ill. 2d 513, 528 (2000).

¶ 77    Defendant notes that in order to rely on such records, they must be of the sort that are reasonably relied on by experts in the given field. See *People v. Williams*, 238 Ill. 2d 125, 152-53 (2010). Defendant points out that Fegely never testified that this was the case. But defendant did not object on this basis. Accordingly, this issue is forfeited. Forfeiture is particularly appropriate where the defendant argues that the State failed to lay the proper technical foundation for the

admission of evidence, and a defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level. *People v. Woods*, 214 Ill. 2d 455, 470 (2005).

¶ 78    Defendant notes that he objected to Fegely's testimony as "junk science," an objection that appears to invoke *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), but cell site data is not new or novel and has been widely accepted as reliable. *People v. Fountain*, 296 IL App (1st) 131474, ¶ 59. And of course, an objection on a specific ground waives all other grounds of objection. *People v. Durk*, 215 Ill. App. 3d 186, 188 (1991). Moreover, we could not reach this issue as plain error. As explained above, the evidence is not closely balanced. Further, we are aware of no case where a defect in the basis of an expert's opinion of the sort that purportedly exists here was found to be a structural error (and defendant does not identify any).

¶ 79    In sum, we reject defendant's contention that Fegely could not base his opinion on hearsay, and we deem this issue forfeited and plain error review unavailing.

¶ 80                          E. Accomplice-Witness Instruction

¶ 81    Finally, defendant argues that the trial court should have given an accomplice-witness instruction regarding Wallace's testimony. As noted above, we apply the abuse-of-discretion standard of review when a party challenges a trial court's decision regarding a jury instruction. *Green*, 2017 IL App (1st) 152513, ¶ 61.

¶ 82    The accomplice-witness instruction provides that if "a witness says he was involved in the commission of a crime with the defendant," that witness's testimony is subject to suspicion and should be treated with caution." *People v. Fane*, 2021 IL 126715, ¶ 36; see also IPI Criminal 3.17. Thus, "[t]his instruction is properly given if a witness is an accomplice and testified on behalf of the State implicating the defendant." *People v. Buffington*, 51 Ill. App. 3d 899, 901 (1977). "The

appropriate test in determining the need for an accomplice instruction is whether there is probable cause to believe that the witness was guilty of the offense in question, either as a principal or, under a theory of accountability, as an accessory." *People v. Harris*, 182 Ill. 2d 114, 144 (1998). Thus, "an accomplice-witness instruction should be given to a jury if all the evidence and the reasonable inferences therefrom establish probable cause to believe not merely that the witness was present and failed to disapprove of the crime, but that the witness participated in the planning or commission of the crime." *People v. Caffey*, 205 Ill. 2d 52, 116 (2001).

¶ 83    Defendant argues that Wallace could have been charged with the offense of which he was convicted. Defendant relies on the following facts in support of this proposition: (1) she allowed Edwards to drive her car and follow defendant to the crime scene, which was unusual in that she typically did not allow anyone to drive her car; (2) she was present all day: at Pepe's, at defendant's home in Aurora prior to the shooting (where she waited in the car), at the crime scene, and at a house in Oswego afterwards; (3) she continued to associate with Edwards and, on one occasion, defendant; (4) she did not report the crime; and (5) she was granted immunity. Defendant points to the fact that she waited in the car when they stopped at defendant's house prior to the shooting, emphasizing "Obviously, she knew she was to wait" and "[t]hat had to have been communicated to her." Further, according to defendant, "Her car circled the block twice in the area of La Flama." How these latter two facts are inculpatory is unclear, and defendant provides no explanation. Indeed, none of the facts cited by defendant are particularly incriminating either.

¶ 84    The most compelling facts simply indicate that Wallace was present when these events transpired. This is insufficient to establish that she was an accomplice, for "[a]person is not accountable by his mere presence at the scene of the crime or his acquiescence in the criminal act." *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 26. It does not necessarily follow that Wallace

was aware of any impending criminality simply because she allowed Edwards to drive, as Wallace testified Edwards insisted, implying she had to be coerced into granting him permission to drive. Moreover, that she continued to associate with Edwards suggests, if anything, that she did not believe she was involved in the offense. If she had participated, she would have had an incentive to stay away to avoid apprehension. We place little weight on the fact that Wallace was granted immunity. Her grant of immunity was negotiated by counsel and is as likely a manifestation of an abundance of caution as it is consciousness of guilt, particularly given that no other facts are indicative of anything more than mere presence. Additionally, when first requested, Wallace spoke with the police without a grant of immunity.

¶ 85    In short, the trial court did not abuse its discretion in refusing this instruction.

¶ 86                                    IV. CONCLUSION

¶ 87    In light of the foregoing, the judgment of the circuit court of Kane County is affirmed.

¶ 88    Affirmed.