2020 IL App (1st) 171723
No. 1-17-1723
Opinion filed June 29, 2020

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 124600 |
| | ) | |
| SHAQUILLE STITTS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Pierce and Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    No eyewitnesses identified the shooter of Torey Long, but a surveillance camera, mounted on the home where officers eventually found defendant Shaquille Stitts, captured a group of young people outside at the time Long was shot. The footage shows people running; one of them appears to have a gun. A jury found Stitts guilty of attempted first degree murder, aggravated battery with a firearm, and unlawful possession of a firearm by a felon, all related to the shooting.

¶ 2   At trial, a detective identified Stitts as the person with the gun. Stitts argues that testimony was improper and, alternatively, even if proper, was admitted without employing the protective procedures outlined in *People v. Thompson*, 2016 IL 118667.

¶ 3   We find the trial court failed to follow the procedures mandated by *Thompson*. Though Stitts acknowledges the issue was forfeited, we find the evidence closely balanced, which excuses Stitts's forfeiture under the first prong of the plain error rule. We reverse the trial court's judgment and remand for a new trial.

¶ 4   We decline to review other issues raised by Stitts because either the trial court never had an opportunity to address them or nothing in the record indicates the issue is likely to recur on remand.

¶ 5                                Background

¶ 6   Torey Long was alone, at midnight, driving his car north on Escanaba Avenue near 79th Street. He looked to his left and saw "someone was approaching with a gun." Long could see that the person was "tall and slim" and wearing a hoodie with the hood up—he could not identify or describe the person's facial features. He "really wasn't focused on the rest [of the person]" because he was "trying to save [his] life at [that] point." As Long continued driving, the person shot at him several times hitting him in the back and face. Long sped away to a gas station, where he found a police officer and told him what happened. Long's injuries included a loss of sight in his left eye.

¶ 7   The only other witness to the shooting, Abejide Toure, was turning in for the night around 11:40 p.m. As he locked his front door, he looked out the window and saw Tyshaun Creed, who he knew from the neighborhood, across the street. Toure went to his dining room and had just sat down when he heard two sounds that he believed were gunshots. Toure went back to his window,

looked out, and saw "a very light-colored car speeding by." He also saw "a guy behind the car shooting." Toure could not identify the shooter. The man who shot the gun walked over to Creed, and they both "ran up into 7912 South Escanaba." Toure called 911.

¶ 8 The building at 7912 South Escanaba Avenue was equipped with surveillance cameras. One camera faced the street. The building's owner gave police permission to download the video from the night of the shooting. The State published the video to the jury through Detective Nathan Poole's testimony. Poole watched the video and "could observe the defendant with a handgun." In court, Poole explained the video to the jury as they watched, identifying Stitts as having the handgun.

¶ 9 Sergeant Nicholas Vasselli (a patrol officer at the time of the offense) responded to a call of shots fired. When he arrived, Vasselli found shell casings on the street and near the sidewalk, so he set up crime scene tape to protect the area. Later he learned the shooter may have run into 7912 Escanaba Avenue. Vasselli went to the back of the building while other officers covered the front. The yard was dark, except for light from a streetlamp in the alley. Vasselli heard a window directly above him open and saw a person, wearing an orange shirt, lean out for about five seconds. Although Vasselli could not see his whole body, he noticed the person had long arms and assumed the person was "fairly tall and skinny." Vasselli also got a look at the person's face and identified Stitts in court as the person he saw. He could identify Stitts from earlier interactions with him.

¶ 10 Stitts threw a towel out of the window. Vasselli watched the towel fall and saw "what appeared to be a handgun fly out of the towel." He heard it hit the ground in the empty lot to the north. Vasselli turned on his flashlight, walked over to where the object had fallen, and "could clearly see that it was a handgun." Another officer came to guard the handgun while Vasselli went

inside to tell officers what he had seen. He saw Stitts again, wearing the same orange shirt as the man he saw throwing the gun.

¶ 11    An evidence technician performed gunshot residue (GSR) tests on Stitts and the other three men in the apartment—Tyshaun Creed, Tracy Jones, and Trevor Wheeler. He tested the back of their hands and their index fingers, middle fingers, and thumbs because "when someone firearms [*sic*] a handgun generally the discharge is going to get on their hand particularly backhand these two fingers and the thumb."

¶ 12    Another evidence technician recovered three shell casings, one live bullet, and the gun from the scene. A third evidence technician test fired the gun found at the scene and determined that it fired all the rounds. No fingerprints were found on the gun or the ammunition.

¶ 13    After their initial detention, officers released all four men while they continued to gather evidence. Officer Sherry Kotlarz, a member of the "fugitive apprehension section," was responsible for finding people "that have either warrants or investigative alerts." She "receive[d] an investigative alert" for Stitts and arrested him.

¶ 14    Mary Wong, an expert in gunshot residue analysis working for the Illinois State Police, was involved with the testing of all four GSR test kits. She only personally tested the kit administered to Tracy Jones. Based on her analysis, she concluded that Jones "may not have discharged a firearm with either hand" and that, if he had, "then the particles were either removed by activity, were not deposited, or not detected by the procedure."

¶ 15    Wong did not personally test the other three GSR kits, but she "peer reviewed" the results reached by another analyst, Robert Berk. Peer review involves a second analyst coming "in after [the original analysis] and review[ing] the data and the paperwork and the report to ensure that the

primary analyst has followed all standard operating procedures and guidelines by the Illinois State Police as well as ensuring that the instrument that is used is in operating procedure." After peer review, the reviewer signs off and sends the file to the supervisor, who does a final "managerial review" and approves the results.

¶ 16    Specifically, as to Berk's analysis, Wong "reviewed his working file, which included the data that is generated for the analysis of [GSR] kits as well as his paperwork that is generated and also his report." As to Wheeler and Creed, Wong testified that Berk concluded neither man may have discharged a firearm and that, if he had, the particles were either removed, not deposited, or not detected—they tested negative for the presence of GSR. Wong testified that she reviewed Berk's results, found them to be accurate, and agreed with his conclusions. Stitts's counsel objected to Wong's testimony about Berk's conclusions relating to Wheeler, and the trial court overruled her objection.

¶ 17    As to Berk's analysis of Stitts's GSR kit, Wong testified that Berk concluded Stitts "either discharged a firearm, was in the vicinity of a discharged firearm, or came into contact with a primer gunshot residue item." Wong phrased Berk's conclusion as a "positive" test for GSR. Once more, Wong agreed with Berk's conclusion.

¶ 18    When it came to the results of the GSR tests that Berk analyzed, Wong testified that the equipment he used was properly calibrated. She explained how calibration works and said that even though she "was not physically present," she could look at Berk's notes and determine that the testing equipment had been correctly calibrated for the tests based on the "working file" for the relevant tests.

¶ 19    During closing argument, the State described Vasselli's observation of Stitts throwing the gun and said that Vasselli "knows this defendant from the neighborhood" and that Stitts was someone "who he knew." In rebuttal, the State again emphasized that Vasselli "knows [Stitts]. He knows him from prior contact." The State made no mention of Kotlarz's testimony describing the circumstances surrounding Stitts's arrest.

¶ 20    The jury found Stitts guilty of attempted murder, aggravated battery with a firearm, and unlawful use of a weapon. The trial court sentenced him to 28 years in prison for attempted murder to run concurrently with a 3-year sentence for unlawful use of a weapon.

¶ 21                                    Analysis

¶ 22    Stitts raises several arguments challenging the fairness of his trial: (i) error in admitting Poole's testimony narrating the surveillance video and identifying Stitts, (ii) error in admitting Vasselli's testimony about knowing Stitts from previous contacts, (iii) error in allowing Kotlarz to testify about arresting Stitts based on an investigative alert, and (iv) error in allowing Wong to testify using a report authored by another analyst in violation of the sixth amendment.

¶ 23    We find Stitts's first argument dispositive and reverse and remand for a new trial on that basis. As to his confrontation clause claim, we consider it prudent to avoid unnecessary constitutional analysis, and we cannot say it or his other claims are "likely" to recur on remand.

¶ 24                        Testimony About Surveillance Video

¶ 25    Stitts argues that the trial court erred by allowing Detective Poole to testify about his opinion that the surveillance video showed Stitts holding a gun. Alternatively, he asserts that, before admitting Poole's testimony, the trial court failed to follow the protective measures set out in *Thompson*, 2016 IL 118667. The State concedes the instructions set out in *Thompson* were not

given, but the State contends the error does not amount to plain error because the evidence against Stitts was overwhelming. We disagree, find the evidence closely balanced, and reverse and remand for a new trial.

¶ 26    Before turning to the plain error analysis, we first determine whether error occurred. *E.g.*, *People v. Staake*, 2017 IL 121755, ¶ 33. The State admits the trial court did not follow the *Thompson* procedures.

¶ 27    In *Thompson*, our supreme court set out three precautions the trial court should take before admitting lay identification testimony by a law enforcement officer. First, the trial court should "afford the defendant an opportunity to examine the officer outside the presence of the jury" so that defendant's counsel can determine the witness's level of familiarity with the defendant and any other bias or prejudice. *Thompson*, 2016 IL 118667, ¶ 59. Second, the trial court should limit an officer's testimony to "consist only of how long he [or she] knew the defendant and how frequently he [or she] saw him or her." *Id.* Finally, the trial court should instruct the jury, both before the testimony and in final instructions, "that it need not give any weight at all to such testimony and also that the jury is not to draw any adverse inference from the fact the witness is a law enforcement officer." *Id.*

¶ 28    The State argues the precautionary measures should not matter for two reasons. First, the supreme court used "should" instead of "shall" when describing the circuit court's obligations. See *id.* The State offers no argument, legal or linguistic, as to why "should" does not indicate a mandatory directive. Justice Burke's opinion for the court, however, explicitly says the trial court erred when "[it] failed to engage in the precautionary procedures *required* for law enforcement

witnesses." (Emphasis added.) *Id.* ¶ 62. We reject the State's argument as contrary to the court's holding.

¶ 29    More substantively, the State argues that Stitts forfeited this argument (which he admits) and he cannot establish plain error because the evidence was overwhelming. Under the first prong of the plain error doctrine, we ask "whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. We undertake this review "evaluat[ing] the totality of the evidence and conduct[ing] a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. We conclude that the evidence is closely balanced.

¶ 30    The only physical evidence was the GSR found on Stitts's hand. Mary Wong testified that Stitts tested "positive" for the presence of GSR, though she qualified her testimony, explaining that Stitts "either discharged a firearm, was in the vicinity of a discharged firearm, or came into contact with a primer gunshot residue item." The only direct evidence of Stitts's contact with the gun used in the shooting came from Vasselli's observation of Stitts throwing the gun out the window. In other words, according to Wong's testimony, Stitts could have tested positive for GSR after he "came into contact with a primer gunshot residue item" when he threw the gun out the window. Of course, the State need not disprove every hypothesis of innocence, and the State may prove its case entirely by circumstantial evidence. See *People v. Pintos*, 133 Ill. 2d 286, 291 (1989). But, on first-prong plain error review, we are not concerned with "the sufficiency of close evidence but rather the closeness of sufficient evidence." *Sebby*, 2017 IL 119445, ¶ 60. No eyewitnesses identified Stitts as the shooter. The video, Vasselli's observations, and the GSR test conclusively

prove, at most, that Stitts touched the gun used in the shooting. This is enough evidence to sustain a conviction, but it falls short of "overwhelming" evidence of guilt.

¶ 31 The parties agree that the trial court did not follow *Thompson* before admitting Poole's testimony narrating the surveillance video. That was error because Poole was a lay law enforcement witness. Finding the evidence closely balanced, we excuse Stitts's forfeiture, reverse the trial court's judgment, and remand for a new trial. Again, we express no opinion on the admissibility of Poole's narration of the surveillance video should the court and parties follow the *Thompson* procedures on remand.

¶ 32                    Testimony About Previous Knowledge and Stitts's Arrest

¶ 33 Stitts also claims the trial court erred in admitting Vasselli's testimony that he knew Stitts from previous interactions and Officer Kotlarz's testimony that Stitts was arrested by the "fugitive apprehension section" after the issuance of an investigative alert. Stitts did not object to that portion of Vasselli's testimony. We have authority to address these claims if we find them likely to recur on remand. *People v. Walker*, 211 Ill. 2d 317, 343 (2004). But we "should refrain from deciding an issue when resolution of the issue will have no effect on the disposition of the appeal presently before the court." *Pielet v. Pielet*, 2012 IL 112064, ¶ 56. Had the trial court ruled adversely to an objection by Stitts's counsel or ruled on a motion for a new trial that contained these issues as claimed errors, we could assume the trial court would be inclined to rule the same way on remand, and we would see a need to provide guidance. Because the trial court has never had an opportunity to rule on the admissibility of Kotlarz's testimony or this portion of Vasselli's testimony in the relevant context, we find it unwise to write what would amount to an advisory opinion.

¶ 34                                Confrontation Clause

¶ 35    Stitts argues that Mary Wong's testimony, relying as it did on the reports and conclusions of a nontestifying analyst, violated his sixth amendment right to confrontation. We know from the record that the nontestifying analyst, Robert Berk, was not present because he was on medical leave. The record does not suggest, and at oral argument the State could not say, that Berk's unavailability is likely to recur. So we decline to address this claim as an exercise of constitutional avoidance. See *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort").

¶ 36    Reversed and remanded.

---

**No. 1-17-1723**

---

| | |
|---|---|
| **Cite as:** | *People v. Stitts*, 2020 IL App (1st) 171723 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-124600; the Hon. Thomas Stanley J. Sacks, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Maria A. Harrigan, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Phyllis Warren, Assistant State's Attorneys, of counsel), for the People. |

---