NOTICE

Decision filed 07/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220817-U

NO. 5-22-0817

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 19-CF-1017 |
| | ) | |
| MICHAEL SIMMONS, | ) | Honorable |
| | ) | Randall A. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Barberis and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The State met its burden of proving the defendant guilty beyond a reasonable doubt of aggravated discharge of a firearm on an accountability theory, and the circuit court did not err in either admitting evidence and allowing testimony, giving jury instructions, conducting jury selection, and dismissing the defendant's claims in a preliminary *Krankel* inquiry. As any arguments to the contrary would lack merit, we grant the defendant's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2    Defendant Michael Simmons was convicted of aggravated discharge of a firearm following a jury trial. He was sentenced to 10 years in the Illinois Department of Corrections (IDOC). The defendant's appointed attorney on direct appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks substantial merit. On that basis, OSAD has filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), along with a memorandum of law in support of that motion.

1

¶ 3    This court provided the defendant an opportunity to file a *pro se* brief, memorandum, or other document explaining why OSAD should not be allowed to withdraw as counsel, or why this appeal has merit. However, no document was filed. This court reviewed OSAD's *Anders* motion, the accompanying memorandum of law, and the record on appeal, and concludes this appeal lacks merit. Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 4                                    I. BACKGROUND

¶ 5    The State charged the defendant with three counts arising from an incident in which he allegedly shot at a moving car. Two of the counts were dismissed before trial, and the State proceeded on the count of aggravated discharge of a firearm, a Class 1 felony. The State alleged that the defendant knowingly discharged a firearm in the direction of a vehicle he knew or reasonably should have known to be occupied by a person. The defendant retained private counsel.

¶ 6                                    A. Pretrial Motions

¶ 7    The State's first motion *in limine* sought to admit testimony regarding surveillance video evidence from Detective Lance Carpenter of the Champaign Police Department. The footage showed a person getting into the driver's seat of a Hyundai sedan. Carpenter identified the defendant as the person in the video based on Carpenter's prior observations of the defendant under different circumstances. Following an evidentiary hearing, the trial court granted the motion over the defense's opposition.

¶ 8    The State filed a second motion *in limine*, seeking permission to present evidence of prior bad acts at trial, including testimony from Carpenter about previous investigations that developed the evidence in the present case against the defendant. The defense objected on the basis that the probative value of the evidence was outweighed by the prejudicial effect to the defendant. The

2

circuit court allowed all of the contested evidence except for a photograph of the defendant holding a gun and testimony about drugs and paraphernalia found in a backpack attributed to the defendant, which the circuit court found to be unduly prejudicial.

¶ 9 The defense filed a motion requesting an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), seeking to suppress evidence seized based on a search warrant issued during a drug investigation of the defendant. The defense alleged that Carpenter submitted two contradictory affidavits to obtain the search warrant. The circuit court denied the motion, finding that Carpenter's listing of the wrong phone number on the search warrant application was negligent, but not a reckless disregard of the truth. Additionally, the circuit court found that Carpenter's allegedly false statement about whether the defendant could be seen in either video of an undercover drug buy was not necessary to the finding of probable cause for the issuance of the warrant.

¶ 10                                    B. Trial

¶ 11 At the defendant's jury trial, the State presented eyewitness and police testimony. Tammy Maggi testified that on June 29, 2019, she was at her home located on West Beardsley Street, in Champaign, when she heard multiple gunshots and called 911. She identified her home security video, which showed a car driving by and someone shooting from inside the car at a blue Hyundai parked in the driveway next door. Two men then got in the Hyundai and followed the first car. Maggi further testified that she saw a hand go out the window of the Hyundai, but did not see a gun in the video. She also saw bullets coming from the other car. The police recovered seven .380-caliber shell casings from the street. No .380 firearm was recovered in connection with this investigation.

¶ 12    The police investigated a second crime scene that same night, less than half a mile away from the incident on West Beardsley Street. Christina Waller testified that she was at home when she heard a gunshot, booming sounds, and speeding cars. From her window, she saw two cars go through the intersection without slowing. She saw a gun and several flashes coming from the passenger side of the second car. Police found five .40-caliber shell casings at the second crime scene. Four of the five shell casings recovered were from the passenger side of the road. Waller could not identify anyone in either car, or the make or model of either car, although she identified both as smaller passenger vehicles. She was shown a photo of a blue Hyundai sedan, which she said was consistent with the second car she saw in the intersection.

¶ 13    Detective Carpenter testified that he had previously encountered the defendant in an unrelated investigation. Over the course of this separate investigation of the defendant, Carpenter had conducted about 20 hours of surveillance on the defendant, who was residing next door to Tammy Maggi on West Beardsley Street. Defendant had a blue Hyundai at the residence. Detective Carpenter testified that the defendant was the only person he saw associated with the Hyundai, and he was able to observe the defendant come and go from the Hyundai. Detective Carpenter had installed a GPS device on the blue Hyundai in connection with this separate investigation of the defendant, and this device was on the car when the shooting incident occurred on West Beardsley Street. Detective Carpenter testified he used a program to assist in tracking the location of the GPS device, and used the data from the GPS device to summarize the path of the Hyundai. Due to signal blockage, however, there was no way to determine the exact path the car had traveled. The State also introduced photos of the blue Hyundai showing damage to the bumper and rear driver's side consistent with gunfire.

¶ 14     Detective Carpenter also reviewed Maggi's security video and identified the defendant as the individual getting into the driver's seat of the Hyundai. He testified that he recognized the defendant in the video based on several factors, including his build, hair, facial structure, glasses, and the defendant's distinctive way of jogging. Carpenter also saw the defendant on the date of his arrest. He identified the defendant in open court.

¶ 15     Asiah Stallworth was the registered owner of the blue Hyundai. She testified that the defendant sometimes stayed at her house, and that he paid for and drove the Hyundai. On the evening of June 21, 2019, Stallworth left her house to spend the night with a friend. She testified that when she left, the defendant, his daughter, his sister, and some other people were in her driveway. Stallworth returned to her residence the following morning. When she arrived, the police were there to execute a search warrant. Stallworth also testified that a backpack the police found while searching her bedroom might belong to the defendant because he was at her house the night before and was the only other person who kept personal items in her bedroom. She also recalled that the police impounded the blue Hyundai that was parked in the driveway of her home. Before impounding the vehicle, the police pointed out that there was a bullet hole in the vehicle. Stallworth testified that the bullet hole appeared to be new damage to her vehicle. She had not seen that damage before.

¶ 16     The police found a cellphone in the backpack, and the parties stipulated that a swab of the cellphone produced DNA suitable for comparison.[1] DNA analysis expert Svetlana Gershburg testified that the cellphone recovered by the police included DNA from three people. Gershburg

---

[1]Detective Carpenter further testified about the cellphone extraction done on the phone found in the backpack at Stallworth's home. It showed that the defendant had texted his cousin that someone shot at him and his daughter in the car, and he responded by shooting back, as he "had no choice."

5

also concluded that there was "strong support" for the defendant being a "contributor to the mixture."

¶ 17   Eric Ruff, the operational team leader of the Urbana Police SWAT team, testified that his team executed a search warrant at an apartment in which the defendant had admitted he stayed the night before. The defendant, who was present during the search, told police that anything they found in the apartment belonged to him. The police found a gun, which did not contain any fingerprints or DNA suitable for analysis. The parties stipulated that the gun was a .40-caliber semiautomatic pistol. A forensic scientist testified that the .40-caliber shells recovered from the crime scene were fired from this weapon; a second examiner confirmed this conclusion.

¶ 18   On May 25, 2022, the jury found the defendant guilty of aggravated discharge of a firearm based on an accountability theory.

¶ 19                              C. *Krankel* Inquiry and Sentencing

¶ 20   After trial, a new attorney filed an appearance on behalf of the defendant as additional counsel. The defense filed a motion for judgment of acquittal notwithstanding the verdict or for a new trial. Before the trial court heard the motion, the defendant sent the circuit court a letter saying that he had just found out that his trial attorney was using heroin while representing him. The defendant attached a redacted Champaign Police Department report dated February 11, 2020, in which police responded to the defense attorney's house due to an overdose of heroin and the attorney was hospitalized.

¶ 21   The sentencing hearing took place on September 15, 2022. The circuit court began by conducting a preliminary inquiry into the allegations in the defendant's letter, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). The circuit court asked the defendant to explain what his defense counsel did wrong, and how this prejudiced him. The defendant stated that his attorney had not

attended various court dates and did not adequately communicate with him, including preparing him for trial. The defendant also alleged that defense counsel had ignored the defendant's request to call his sister as a witness, and did not show him certain video evidence that was shown at trial. After allowing defense counsel to respond, the circuit court denied the appointment of new counsel. The circuit court next heard argument on the defendant's posttrial motion, and denied it as well.

¶ 22    At sentencing, the circuit court and all counsel agreed that the defendant was eligible for a sentence of 4 to 15 years in IDOC, with 2 years of mandatory supervised release (MSR) and 190 days' credit for time served. The State argued in aggravation, the defense did not present any mitigating factors, and the defendant did not speak in allocution. The circuit court sentenced the defendant to 13 years in IDOC, to be served at 85%, with 2 years of MSR and credit for time served.

¶ 23    The defendant's posttrial counsel filed a motion to reconsider, arguing that the sentence was excessive. Following a hearing on the motion, the circuit court determined that it had placed too much importance on the defendant's pending cases during sentencing. The motion was granted, and the defendant's sentence was reduced to 10 years in IDOC over the State's objections. The circuit court entered an amended judgment on November 18, 2022.

¶ 24    This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    OSAD argues that the circuit court properly entered judgment against the defendant, and that there are no meritorious arguments to the contrary. In the memorandum supporting its *Anders* motion to withdraw as counsel, OSAD states that it considered raising eight potential issues on appeal:

(1) Whether the trial court erred in granting the State's motion *in limine* and allowing Detective Carpenter to testify that he identified Simmons from a security camera video;

(2) Whether the trial court erred when it did not provide jury instructions on the lesser included offenses of reckless conduct or reckless discharge of a firearm;

(3) Whether Simmons could be convicted of aggravated discharge of a firearm under an accountability theory when the State could not identify the principal;

(4) Whether the trial court erred in denying new counsel after a preliminary *Krankel* inquiry;

(5) Whether there was sufficient evidence to prove Simmons guilty beyond a reasonable doubt;

(6) Whether any errors occurred during jury selection;

(7) Whether there was error in the admission of expert testimony; and

(8) Whether trial counsel's failure to provide the trial court with the necessary authority to house Simmons in Champaign County pending and during trial was ineffective assistance based on the facts currently in the record?

OSAD has determined that these issues would be without arguable merit, and the circuit court's judgment was, therefore, proper. As we agree with the State's assessment, we grant OSAD leave to withdraw.

¶ 27                    A. Carpenter's Identification Testimony

¶ 28    At trial, the State sought to show that the defendant was the driver of the Hyundai that chased, and fired shots at, the first car. The only evidence of this came from Maggi's security camera footage, which captured the incident. The State filed a motion *in limine* to admit the home security video, alleging that Detective Carpenter should be allowed to identify the defendant as the man seen in the video getting into the driver's seat of the Hyundai. The circuit court held an evidentiary hearing and granted the motion over the defense's objection. The defense preserved the issue by raising it in its posttrial motion.

8

¶ 29 Where a non-expert witness offers testimony in the form of opinions, Illinois Rule of Evidence 701 requires that the opinions be "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702" (Ill. R. Evid. 701 (eff. Jan. 1, 2011)). We review the trial court's decision to admit lay opinion identification testimony for an abuse of discretion. *People v. Thompson*, 2016 IL 118667, ¶ 49; *People v. Longs*, 2024 IL App (4th) 230501, ¶ 37.

¶ 30 In *Thompson*, our supreme court explained the following regarding the depth of knowledge that the identifying witness must have about the defendant:

> "Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Thompson*, 2016 IL 118667, ¶ 50.

Furthermore, the extent of the identifying witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility. *Id.* ¶ 53.

¶ 31 The *Thompson* court also adopted a totality-of-the-circumstances approach for determining whether lay opinion identification testimony is admissible. *Id.* ¶¶ 50-51. The trial court should consider the following factors in deciding whether the witness is more likely to correctly identify the defendant:

> "[T]he witness's general familiarity with the defendant; the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; whether the defendant was disguised in the recording or changed his/her appearance between the time of the recording and trial; and the clarity of the recording and extent to which the individual is depicted." *Id.* ¶ 51.

9

"[T]he absence of any particular factor does not render the testimony inadmissible." *Id.* Conversely, the presence of even one of these factors suggests that some basis exists for a finding that the witness is more likely than the jury to correctly identify the defendant from the relevant piece of evidence. *Id.* ¶ 49.

¶ 32 When the lay witness offering opinion identification testimony is a law enforcement officer, the trial court should allow the defendant the opportunity to examine the witness outside the presence of the jury. *Id.* ¶ 59; *People v. Stitts*, 2020 IL App (1st) 171723, ¶ 27. As our supreme court explained:

> "This will provide the defendant with an opportunity to explore the level of the witness's familiarity as well as any bias or prejudice. Moreover, it will allow the circuit court to render a more informed decision as to whether the probative value of the testimony is substantially outweighed by the danger of unfair prejudice." *Thompson*, 2016 IL 118667, ¶ 59.

The court further stated that while the witness may identify himself as law enforcement, his testimony about his familiarity with the defendant should be limited to only how long he knew him and how frequently he saw him. *Id.*

¶ 33 To avoid usurping the function of the jury, the trial court should instruct the jury, both before the testimony and in final instructions, that it need not give any weight to the testimony or draw any adverse inferences from the fact that the witness is a law enforcement officer. *Id.*; *Stitts*, 2020 IL App (1st) 171723, ¶ 27. Finally, while relevant lay opinion identification testimony may be admitted pursuant to the principles discussed above, it may nevertheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011); see also *Thompson*, 2016 IL 118667, ¶ 54.

¶ 34 The State introduced the video at the pretrial hearing, and presented evidence on the five factors our supreme court laid out in *Thompson*. Carpenter testified that he was assigned to an

10

unrelated investigation, during which he reviewed booking photos, Facebook photos, and a video of the defendant. After obtaining a warrant and installing a GPS tracker on the blue Hyundai, Carpenter surveilled the car and the defendant for over 16 hours over nine days, which occurred immediately before and after the date of the car shooting. Carpenter identified the defendant in open court as the only individual he saw associated with the Hyundai over the course of his surveillance.

¶ 35    Carpenter also testified that he watched the video from Maggi's security camera and recognized the defendant as the person seen getting into the driver's seat of the Hyundai and driving off. He recognized the defendant because Detective Carpenter was familiar with the defendant's appearance, because the defendant was the primary driver of this car, and because Carpenter had seen the defendant on multiple occasions going in and out of the residence where the car was parked. Although the defendant's face was never directly facing the camera, Carpenter testified that he could identify the defendant by his general height and build, his braided hair and glasses, and the "[v]ery distinct way in which he ran on his toes and swaying his arms." A few weeks after the incident, Carpenter personally interviewed the defendant for about an hour; he confirmed that the defendant looked the same as he did in the security video. Carpenter concluded that, based on the number of times he had personally observed the defendant, and his review of the surveillance footage, he was certain that it was the defendant in the video.

¶ 36    After considering the security video, Carpenter's testimony, and argument from both sides, the circuit court found that the detective's familiarity with the defendant was sufficient to allow the jury to hear his identification testimony. The circuit court specifically explained that it was "very clear that [Carpenter] has had an opportunity to see Defendant outside in the public in various ways, various times, as close as face-to-face. So, he knows the Defendant and the way he looks.

11

His complexion, his facial structure, his hair, his gait while walking, his gait while running that the jury doesn't understand." The circuit court also acknowledged the risk of prejudice to the defendant because the jury would hear that officers were surveilling him for an unrelated matter. But the circuit court noted that it was common practice to allow such testimony from law enforcement officers where the potentially prejudicial evidence is "sanitized" by means of proper instructions to the jury, "given before the testimony and at the end of the case." The circuit court concluded that "[t]here is always prejudice, but it's not unfair."

¶ 37    The circuit court further acknowledged the defense's arguments, including that Carpenter had never seen the defendant during nighttime, and that the security footage was grainy. The circuit court noted that the defense could point this out at trial, as well as calling its own witnesses "to say that we know the Defendant very well, and that's not him." The circuit court concluded that it was proper to allow Carpenter's identification testimony, along with the "sanitizing information" and jury instructions.

¶ 38    The presence of any one of the *Thompson* factors indicates that there is a basis for concluding that Carpenter was in a superior position to identify the defendant from the security video than the jury. See *Thompson*, 2016 IL 118667, ¶ 49. When viewing the totality of the circumstances, we agree with the circuit court that Carpenter had multiple opportunities to familiarize himself with the defendant's appearance and distinctive traits, specifically during the time just before the incident. Carpenter's contact with the defendant included hours of surveillance, viewing numerous photos, and meeting the defendant in person. Carpenter clearly had an advantage over the jury in his ability to identify the defendant, particularly—as the trial court also recognized—because the jury would not have an opportunity to see the defendant's distinctive gait

12

in the courtroom. See *id.* ¶ 50 ("the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful").

¶ 39    Furthermore, the circuit court held a pretrial hearing at which the defense examined Carpenter outside of the jury's presence. See *id.* ¶ 59. The circuit court also provided the jury with instructions consistent with *Thompson* before Carpenter's testimony and during final instructions. *Id.*; *Stitts*, 2020 IL App (1st) 171723 ¶ 27. Lastly, the court weighed the probative value of the identification evidence against the danger of unfair prejudice to the defendant, and decided that, with the measures in place to "sanitize" the evidence, the balance favored allowing Carpenter's identification testimony. See Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Thompson*, 2016 IL 118667, ¶ 54.

¶ 40    Therefore, we find that the circuit court did not err by granting the State's motion *in limine* and allowing Carpenter to identify the defendant at trial. We further find that any argument to the contrary would lack merit.

¶ 41                B. Jury Instructions on Lesser Included Offenses

¶ 42    The defendant was tried on and convicted of the offense of aggravated discharge of a firearm, a Class 1 felony. OSAD notes that the Class A misdemeanor of reckless conduct is a lesser included offense of aggravated discharge of a firearm. *People v. Williams*, 293 Ill. App. 3d 276, 281 (1997). OSAD argues that where the defendant is alleged to have fired at a person, "reckless discharge of a firearm is a lesser included offense of aggravated discharge of a firearm, the operant difference being the mental state required to prove each offense," quoting *People v. Shelly*, 2024 IL App (3d) 220432, ¶ 39.

¶ 43    A defendant has the right to request a jury instruction for any lesser included offense of the charged offense. *People v. Medina*, 221 Ill. 2d 394, 403-04 (2006) (discussing *People v. Brocksmith*, 162 Ill. 2d 224 (1994)). Our supreme court has held that this right belongs exclusively

13

to the defendant, not his counsel, as it is analogous to the defendant's right to decide what plea to enter, including whether to initially plead guilty to a lesser charge. *Brocksmith*, 162 Ill. 2d at 229. Where a defendant fails to tender an instruction at trial, he waives the issue on appeal. *People v. Carter*, 208 Ill. 2d 309, 319 (2003); *People v. Smith*, 2019 IL App (1st) 161246, ¶¶ 50-51.

¶ 44    In *Carter*, the defendant challenged his first degree murder conviction, arguing that the trial court should have tendered an instruction to the jury on the lesser included offense of involuntary manslaughter. *Carter*, 208 Ill. 2d at 316. Our supreme court found that the defendant had knowingly and voluntarily informed the trial court that he did not want the lesser included offense instruction tendered. *Id.* at 319-20. The circuit court ruled that the defendant had waived this challenge, explaining that "[u]nder the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *Id.* at 319.

¶ 45    In the present matter, the defendant's trial counsel did not tender any jury instructions to the circuit court during the instruction conference. The circuit court asked the defendant whether there were any additional instructions, including specifically for lesser included offenses, that he would like tendered. The defendant affirmatively responded that there were none.

¶ 46    While nothing in the record suggests that the defendant's decision was not knowing and voluntary, we note that the circuit court was not obligated to conduct any further inquiry on this point. See *Medina*, 221 Ill. 2d at 409 (explaining that the trial court generally need not interject itself into the decision whether to tender a lesser included offense instruction). In fact, our supreme court has noted that if the circuit court were required to advise a defendant of his right to tender such an instruction, it could improperly interfere with the attorney-client relationship and defense

14

counsel's legal strategy by "influenc[ing] the defendant to tender an instruction he otherwise would have chosen to forgo." *Id.*

¶ 47 We conclude that the defendant has waived the argument that the circuit court erred by failing to instruct the jury on either abovementioned lesser included offense. The defendant's response to the circuit court that he did not wish to tender any jury instructions would constitute invited error on this issue. Furthermore, unlike the doctrine of forfeiture, waiver precludes plain-error review. See *Smith*, 2019 IL App (1st) 161246, ¶¶ 47-48. We find that any arguments on this point would be meritless.

¶ 48                                   C. Conviction on an Accountability Theory

¶ 49 The defendant was charged by information with aggravated discharge of a firearm, a Class 1 felony, in violation of section 24-1.2(a)(2) of the Criminal Code of 2012 (720 ILCS 5/24-1.2(a)(2) (West 2018)). The State alleged in the information that he "knowingly discharged a firearm in the direction of a vehicle he knew or reasonably should have known to be occupied by a person." The State made no reference to the defendant being accountable for the acts of a principal shooter in the information.

¶ 50 At trial, the State argued that someone shot at the defendant's Hyundai, so the defendant and another individual got in the Hyundai and followed the first car for several blocks, returning fire. The individual, who was in the passenger seat of the Hyundai, while the defendant drove, was never identified, and the State only referred to him as the defendant's friend. The State also did not specify whether the defendant was alleged to be the principal or an accomplice in committing the charged offense, instead telling the jury, "If the Defendant's finger was on the trigger, he is guilty. If the Defendant's foot was on the accelerator he's guilty. It doesn't matter."

15

¶ 51    A defendant may be charged as a principal, but convicted on a theory of accountability, if supported by the evidence. *People v. Ceja*, 204 Ill. 2d 332, 361 (2003) (ruling that no error occurred where the indictment charged defendant as a principal, the evidence did not establish which shooter killed which victim, and the State prosecuted defendant under a theory of accountability); *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 72. This is permissible "because accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense." *Ceja*, 204 Ill. 2d at 361. Therefore, the charging instrument "need not specify whether the accused is charged as a principal or an accomplice." *People v. Rebollar-Vergara*, 2019 IL App (2d) 140871, ¶ 67 (discussing *Ceja*). Furthermore, a defendant may be found guilty under an accountability theory even where the identity of the principal is unknown. *People v. Cooper*, 194 Ill. 2d 419, 435 (2000); *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 75.

¶ 52    In light of this caselaw, we find that the defendant's charge and conviction, where the principal shooter could not be identified, was proper. The State did not err in either the preparation of the charging instrument or in its prosecution of the defendant at trial on the issue of conviction pursuant to an accountability theory. Nor did the circuit court err in allowing the State to secure the defendant's conviction in this manner. We further find that there is no meritorious argument on this point.

¶ 53                    D. Denial of New Counsel After *Krankel* Inquiry

¶ 54    The circuit court held a preliminary *Krankel* inquiry at the start of the defendant's sentencing hearing, in response to a letter he sent the circuit court after his conviction, alleging that his defense counsel had overdosed on heroin while representing him. *Krankel*, 102 Ill. 2d 181. The circuit court asked the defendant to explain his attorney's errors and how they prejudiced his defense. The defendant made various allegations about defense counsel's actions and conduct, but

16

did not speak to the question of prejudice, or how the results of his trial would have been different, but for defense counsel's errors.

¶ 55    After hearing from the defendant and defense counsel, the circuit court stated that it found the defendant's claims to "all fall in the category *** of conclusory, misleading, speculative, legally immaterial, or they pertain solely to issues of trial strategy." The circuit court declined to appoint new counsel, and continued on to sentencing. OSAD has considered whether a meritorious claim may be brought on appeal alleging that the circuit court erred in dismissing the defendant's claim of ineffective assistance of counsel.

¶ 56    Pursuant to *Krankel* and its progeny, whenever a defendant makes a *pro se* posttrial claim of ineffective assistance of counsel the circuit court must first determine the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). The purpose of a *Krankel* inquiry "is to ascertain the underlying factual basis for the ineffective assistance claim and to afford the defendant an opportunity to explain and support his claim." *People v. Ayres*, 2017 IL 120071, ¶ 24. "[A] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention." *Id.* ¶ 11. The defendant need not file a formal motion; he may merely raise the issue orally, or through a letter or note to the court. *Id.*; *People v. Bates*, 2019 IL 124143, ¶ 15. As long as he clearly alleges to the circuit court that he received ineffective assistance of counsel, a *pro se* defendant "need not provide the underlying factual basis for his claim." *Bates*, 2019 IL 124143, ¶ 15; see also *People v. Taylor*, 237 Ill. 2d 68, 76 (2010) (explaining that claims can be "unconventional," as long defendants "expressly complained about counsel's performance").

¶ 57    Where a defendant has notified the circuit court that he believes he received ineffective assistance of counsel, "the court must inquire into his claim." *Bates*, 2019 IL 124143, ¶ 15. On review, our primary concern is the adequacy of the circuit court's inquiry—whether it is "sufficient

17

to determine the factual basis of the claim." *Ayers*, 2017 IL 120071, ¶¶ 11, 13. While there is no exact procedure the circuit court must take in making its inquiry, our supreme court has provided guidance regarding how the circuit court may proceed. Specifically, " 'some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim.' " *Id.* ¶ 12 (quoting *People v. Jolly*, 2014 IL 117142, ¶ 29). In addition to speaking with defense counsel and the defendant regarding the defendant's allegations, the circuit court "is permitted to make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Id.*; see also *Jolly*, 2014 IL 117142, ¶ 30.

¶ 58    If the circuit court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, it need not appoint new counsel, and may deny the *pro se* motion. *Jolly*, 2014 IL 117142, ¶ 29 (quoting *Moore*, 207 Ill. 2d at 77-78). However, if the allegations show possible neglect of the case, the court should appoint new counsel *Id.*

¶ 59    Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). To prevail on an ineffective assistance claim, the defendant must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). More specifically, he must show "that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* ¶ 36 (quoting *Strickland*, 466 U.S. at 694). Additionally, he must "overcome the strong presumption that the

18

challenged action or inaction may have been the product of sound trial strategy," as "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

¶ 60    In addition to the allegations he made in his letter to the circuit court regarding defense counsel's drug use, which he did not repeat at the preliminary *Krankel* hearing, the defendant raised several issues before the circuit court. He claimed that he did not hear from his attorney for a long period of time, and that sometimes a different attorney from his law firm, rather than the defendant's counsel himself, attended court hearings in the case. He added that there were several times that he or his family members tried to contact his attorney and received no response. He further alleged that defense counsel did not adequately prepare him for trial, specifically citing counsel's supposed failure to review all discovery with him—including a video that was played at trial—and ignoring the defendant's request to call his sister as a witness. The defendant also claimed that counsel did not consult with him before filing a motion for a new trial, and the defendant was unaware of the issues counsel raised in this motion.

¶ 61    The circuit court allowed defense counsel to respond. He said that he did contact the defendant's sister and discussed potential testimony, but decided after their conversation that she would not be a good witness. Defense counsel claimed to have reviewed all of the video evidence with the defendant before trial. He also said that the jail records from each facility at which the defendant was held before trial would show that he visited the defendant a number of times to review evidence.

¶ 62    The circuit court found that the defendant had representation throughout the case, and it was "legally immaterial" whether his specific attorney or someone else from his firm appeared in court with the defendant. The circuit court also noted that defense counsel represented the

19

defendant at trial. Regarding the competing testimony from the defendant and defense counsel on whether the latter had gone over discovery with his client before trial, the circuit court stated that this presented a credibility issue, and noted that the defendant even admitted to having seen some of the evidence in question and to having reviewed it with counsel. See *People v. Galarza*, 2023 IL 127678, ¶ 25 (stating that the trier of fact is better positioned than the reviewing court to resolve conflicting testimony and determine the credibility of witnesses, and we will not substitute its judgment for our own on such questions).

¶ 63    Additionally, the circuit court found that defense counsel's decision not to call the defendant's sister after looking into her potential testimony was a matter of trial strategy, which could not serve as the basis of a *Krankel* claim. See *People v. Jackson*, 2020 IL 124112, ¶ 106 (explaining that the decision whether to call certain witnesses is a matter of trial strategy, and cannot serve as the basis of a *Krankel* claim). Similarly, the circuit court found that defense counsel's motion for a new trial was "filled with *** potentially valid issues," and defense counsel's determination of the contents of a motion was also a matter of trial strategy.

¶ 64    We find that the circuit court properly held a preliminary *Krankel* inquiry in response to the defendant's *pro se* allegations of ineffective assistance of counsel, and did not err in declining to appoint new counsel and proceed to second-stage *Krankel* proceedings. The circuit court questioned the defendant and defense counsel regarding the defendant's allegations, and considered defense counsel's representation of the defendant at trial. We will not disturb the circuit court's determinations of credibility or its resolution of conflicting statements between the defendant and defense counsel. The circuit court further properly noted that some of the defendant's allegations involved matters of trial strategy. Nothing in the record supports the argument that the circuit court incorrectly found the defendant's claims to be conclusory,

20

speculative, and/or immaterial. The defendant also did not address how defense counsel's alleged ineffective assistance prejudiced the defendant's defense. We conclude that any claim based on the circuit court's preliminary *Krankel* inquiry would lack merit.

¶ 65                                    E. Guilt Beyond a Reasonable Doubt

¶ 66     To sustain a conviction of a criminal offense, the State bears the burden of proving the existence of every element of the offense beyond a reasonable doubt. U.S. Const., amend. XIV; *People v. Lucas*, 231 Ill. 2d 169, 178 (2008) (citing *Jackson v. Virginia*, 443 U.S. 307, 316 (1979)). On appeal, it is not our duty to retry the case; rather, we consider the evidence in the light most favorable to the prosecution, and "determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson*, 443 U.S. at 319); see also *People v. Ephraim*, 323 Ill. App. 3d 1097, 1109-10 (2001). We further resolve all reasonable inferences from the record in favor of the prosecution, regardless of whether the evidence was direct or circumstantial. *People v. Perkins*, 2023 IL App (5th) 220108, ¶ 22. We also defer to the trier of fact on matters of witness credibility, the weight to be given to their testimony, the resolution of conflicts in the evidence, and the reasonable inferences to draw from all of the evidence. *Id.* On review, we will not reverse a conviction unless the presented evidence was so improbable or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id.*; *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007).

¶ 67     To convict the defendant of aggravated discharge of a firearm, the State bore the burden of proving beyond a reasonable doubt that he (1) knowingly or intentionally discharged a firearm (2) in the direction of another person or in the direction of a vehicle he knows or reasonably should know is occupied by a person. *People v. Daheya*, 2013 IL App (1st) 122333, ¶ 64; 720 ILCS 5/24-1.2 (West 2018). Because the State relied on an accountability theory of guilt, it was required to

21

show that the defendant was legally accountable for the conduct of another, regardless of whether the identity of this other person was known. *Cerda*, 2021 IL App (1st) 171433, ¶¶ 73, 75.

¶ 68    A person is legally accountable for the conduct of another where " 'either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.' " *Id.* ¶ 73 (quoting 720 ILCS 5/5-2(c) (West 2010)). The State may establish intent under an accountability theory by either showing that the defendant shared the principal's criminal intent or showing the existence of a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. A common criminal design need not be shown by words of agreement, but may be inferred from the circumstances surrounding the crime. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 52.

¶ 69    At trial, the State presented evidence showing that the defendant drove a blue Hyundai sedan that was frequently parked at the West Beardsley address. This vehicle was located at this address immediately before the car chase and shooting. Maggi's security camera captured two men getting into the Hyundai and driving off, pursuing the car that had fired the first shot. Detective Carpenter identified the defendant as the person in the video seen getting into the driver's side of the Hyundai. Another witness testified that she saw two cars speeding through the intersection outside her house, with shots being fired from the passenger side of the second car. She further stated that a photo of the blue Hyundai was similar to the second car she had seen. The Hyundai's course of travel was also supported by GPS tracking evidence.

¶ 70    The Hyundai's registered owner, Asiah Stallworth, testified that the defendant often drove her car, and that both the defendant and the car were in her driveway when she left her house on the evening of the incident. The following morning, the police conducted a search of her home and

22

impounded the Hyundai. Before removing the Hyundai, the police pointed to a bullet hole in the vehicle. Stallworth indicated that the bullet hole had not been there the previous day. The police also located a cellphone in a backpack found during a search of Stallworth's bedroom. The cellphone contained a mixture of DNA. The State's DNA expert testified that there was strong support for the defendant's DNA being part of that mixture. Carpenter testified that the cellphone contained texts between the defendant and his cousin from after the incident, in which the defendant told his cousin that he was shot at while in his car with his daughter, and he had no choice but to shoot back.

¶ 71    Police found five shell casings along the road where a witness had observed the car shooting. Four casings were located on the passenger side of the road. The police had executed a search warrant on July 11, 2019, at an apartment where the defendant had stayed the night before. During the search, the police found a gun. The defendant told the police that anything they found in the apartment during their search belonged to him. Forensic expert testimony matched the shell casings to a gun that police found while executing a search warrant.

¶ 72    Based on all of the evidence presented at trial, we find that the State met its burden of proof on each element of aggravated discharge of a firearm beyond a reasonable doubt. Each point of the State's argument that the defendant drove the Hyundai that was used in the shooting incident, while his passenger fired at the first car with the defendant's gun, was supported by ample evidence. The evidence showed that the defendant was chasing a car that was fleeing, even though shots had been fired from that vehicle, and that he texted after the incident that he "had no choice" but to shoot back. This sufficiently established that he knowingly discharged a firearm—or facilitated his passenger's discharge of a firearm—in the direction of a vehicle he knew to be occupied by another person or persons.

23

¶ 73    Regarding the defendant's legal accountability for the offense, the jury heard that the defendant was present during the commission of the crime as the driver, that his gun was used in the shooting, that he showed his intent to shoot back at the first car, that the defendant fled after the shooting, and he never disclosed the name of his passenger or reported the crime. See *Fleming*, 2014 IL App (1st) 113004, ¶ 53 (stating that, in determining legal accountability, trier of fact may consider the defendant's presence during the commission of the crime, continued close association with other offenders afterwards, failure to report the crime, and flight from the scene).

¶ 74    Viewing the evidence in the light most favorable to the State and drawing all reasonable inferences in the State's favor, we cannot conclude that the evidence presented to the jury "was so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant." *Perkins*, 2023 IL App (5th) 220108, ¶ 22. Therefore, we find that the State met its burden of proving that the defendant was guilty of aggravated discharge of a firearm beyond a reasonable doubt, and there is no meritorious argument to the contrary.

¶ 75                              F. Jury Selection

¶ 76    Pursuant to Illinois Supreme Court Rule 431, in conducting a *voir dire* examination, the circuit court must ask each potential juror whether he or she understands and accepts the following principles:

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

The rule allows the circuit court to ask these questions to the potential jurors individually or as a group. *Id.*; see also *People v. Birge*, 2021 IL 125644, ¶ 27. Our supreme court has held that a violation of Rule 431(b), where the defendant has failed to preserve this issue, is not the kind of

structural error that requires automatic reversal under a plain-error analysis. *Birge*, 2021 IL 125644, ¶ 24. Rather, the defendant must show that the violation was a clear and obvious error, which "alone threatened to tip the scales of justice against the defendant." *Id.*

¶ 77    In the present matter, the circuit court read all four of the Rule 431(b) principles to the jury, and then asked them individually, "[D]o you understand and accept those principles of law?" Each juror answered in the affirmative on all points. The circuit court also "acquaint[ed] prospective jurors with the general duties and responsibilities of jurors," and allowed counsel for both sides to ask additional questions of the potential jurors. Ill. S. Ct. R. 431(a) (eff. July 1, 2012). The jury was properly sworn in prior to hearing any testimony. We find that there is nothing in the record that could support a meritorious challenge to the jury selection process.

¶ 78                                   G. Admission of Expert Testimony

¶ 79    OSAD next acknowledges that the State presented testimony from three opinion witnesses without first qualifying those witnesses as experts. These included two witnesses from the Illinois State Police Forensics Lab—one who testified about firearm and toolmark identification, and the other about DNA analysis performed on the cellphone—and one witness who testified about the results of the cellphone data extraction. The State asked each witness about their qualifications and then presented their respective opinions without first tendering the witnesses to the circuit court or asking the circuit court to accept them as experts in their fields. Defense counsel did not challenge the witnesses' qualifications or request to conduct *voir dire* of the witness, and did not object to admitting their testimony.

¶ 80    Illinois Rule of Evidence 702, regarding expert testimony, states in relevant part that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

25

experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011). This evidentiary rule does not require the circuit court to certify an expert witness before he or she can offer opinion testimony. *People v. Pingelton*, 2022 IL 127680, ¶ 62. However, the admission of expert testimony " 'requires the proponent to lay an adequate foundation establishing that the information upon which the expert bases his opinion is reliable.' " *People v. Safford*, 392 Ill. App. 3d 212, 221 (2009) (quoting *Hiscott v. Peters*, 324 Ill. App. 3d 114, 122 (2001)).

¶ 81    A witness is generally permitted to testify as an expert " 'if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion.' " *People v. King*, 2020 IL 123926, ¶ 35 (quoting *People v. Enis*, 139 Ill. 2d 264 (1990)). The decision whether to admit an expert's testimony is left to the discretion of the circuit court. *Id.*; *Safford*, 392 Ill. App. 3d at 221. In making its determination, the circuit court "should balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony," as well as considering "the necessity and relevance of the expert testimony in light of the particular facts of the case." *King*, 2020 IL 123926, ¶ 35.

¶ 82    In the present matter, the defense never challenged the qualifications of any of the State's expert witnesses. As such, the circuit court was not required to certify any of these individuals as experts prior to their respective testimony. See *Pingelton*, 2022 IL 127680, ¶¶ 62-63 (ruling that trial counsel's lack of objection to the trial court's failure to certify doctor witnesses as experts could not support an ineffective assistance claim, as the court was not required to certify them as experts and any such objection would thus be meritless). We find no error in the circuit court's

admission of expert testimony from the three aforementioned witnesses. We further find that there is no meritorious argument that could be brought on this issue.

¶ 83                              H. Ineffective Assistance of Counsel

¶ 84    Lastly, OSAD raises one more potential argument relating to an ineffective assistance of counsel claim not covered by the *Krankel* proceedings previously discussed. Prior to trial, defense counsel filed a motion asking the court to order the Champaign County Sheriff to house the defendant in the Champaign County jail instead of three hours away at the Kankakee County jail, so that defense counsel could be in closer contact with the defendant in preparation for trial. At the hearing on this motion, the circuit court asked defense counsel for any legal authority allowing the circuit court to order the sheriff where to house inmates. Defense counsel responded that he had researched the issue, but had not found anything dispositive. However, he continued, "there's got to be something out there *** that states that prisoners should be housed, especially on the eve of trial, within close proximity to their defense counsel." The circuit court denied the motion.

¶ 85    Defense counsel also complained to the circuit court at trial that the defendant had been taken back to Kankakee County over a three-day recess, during which defense counsel was unable to schedule a visit with the defendant and was only allowed one phone call with him for 30 minutes. Defense counsel asked the circuit court to order that the defendant remain in the Champaign County jail for the rest of the trial. The circuit court responded that it had no control over the matter.

¶ 86    Our supreme court has explained that "both the federal constitution and our state constitution afford criminal defendants the general right to be present, not only at trial, but at all critical stages of the proceedings, from arraignment to sentencing." *People v. Lindsey*, 201 Ill. 2d 45, 55 (2002). The right to be present at trial is implied under both our federal and state

27

constitutions. *Id.* (citing U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 8). OSAD argues that this must include pretrial motions and preparations, as both are considered "critical stages" in criminal proceedings. See *People v. Hughes*, 315 Ill. App. 3d 86, 94 (2000).

¶ 87    OSAD further points to two additional potential arguments that defense counsel could have attempted to make to secure the defendant's presence in Champaign County during preparation and trial. We need not expand on these here, as we agree with OSAD that any claim of ineffective assistance of counsel on this issue would fail under the second prong of the *Strickland* test. In addition to the principles summarized in our earlier discussion, we add that while a defendant must satisfy both *Strickland* prongs, if his ineffective assistance claim "can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Evans*, 186 Ill. 2d 83, 94 (1999).

¶ 88    Even if the defendant could demonstrate on appeal that defense counsel's performance was deficient due to his failure to properly pursue and support his request to have the defendant held in Champaign County, the record is devoid of support for a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Domagala*, 2013 IL 113688, ¶ 36. Defense counsel informed the circuit court during the preliminary *Krankel* inquiry that he was able to visit the defendant at both jails to prepare for trial and review discovery. The circuit court also rejected the defendant's allegations regarding his attorney's lack of communication with him and failure to adequately prepare him for trial.

¶ 89    During trial, defense counsel was still able to speak with the defendant over the phone during the three-day recess, and there is no indication that he would have had more time with the defendant in Champaign County, or that any additional time with him would have changed the

28

outcome of the trial. The State established the elements of aggravated discharge of a firearm under an accountability theory beyond a reasonable doubt, and nothing in the record suggests that the jury would not have found him guilty had his defense attorney had more convenient access to him.

¶ 90　　We therefore find that there is no merit to any claim of ineffective assistance of trial counsel relating to having the defendant transferred closer to the courthouse for trial preparation and trial.

¶ 91　　　　　　　　　　　　　III. CONCLUSION

¶ 92　　As this appeal presents no issue of arguable merit, we grant OSAD leave to withdraw and affirm the circuit court's judgment.

¶ 93　　Motion granted; judgment affirmed.